UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Timothy Wayne Wilbanks, #400318, ) | C/A No. 7:22-2388-MGL-TER |
| Plaintiff, ) | |
| v. ) | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Deputy Nicholas Harakas, ) Deputy C. Evangelista, Deputy M. Miller, ) Deputy D. Pretlove, Deputy M. Mapstone, ) Deputy S. Powell, Sgt. J. Knisely, ) Investigator M. Stevenson, ) | |
| Defendants. ) | |

## FACTS

On November 9, 2021 at approximately 7:40 a.m., Spartanburg County deputies received a call about an armed robbery that had just occurred at a convenience store located at 7558 Asheville Highway in Spartanburg County. Deputies responded to the scene and received a description of the suspect from a female victim, who claimed the suspect had pointed a handgun at her face and forced her to give him approximately $300 in cash. Deputies on the scene passed the subject's description along to other law enforcement personnel over the radio. According to the victim, the suspect was driving a red SUV, and wearing a blue mask, black hat, long sleeve shirt and shorts. It was first reported that the subject might be an older black male, but after the store owners shared the store surveillance video with the one of the deputy's on the scene, the report was revised indicating that the suspect was a white male. Sergeant Joshua Knisely ("Knisely") was patrolling in the area and heard the description over the radio of the suspect. He

observed a red Dodge Durango SUV idling in a parking lot at 7990 Asheville Highway, only a short distance from the scene of the robbery. He approached the vehicle and made contact with the driver and sole occupant, who identified himself as Timothy Wayne Wilbanks ("Wilbanks").Wilbanks was wearing a black hat, a blue neck gaiter, and a long sleeve shirt.  As Knisely returned to his patrol vehicle to confirm the identity of the armed robbery suspect, Wilbanks backed up his vehicle and advised Knisely that he was running low on gas and needed to go the gas station located approximately .10 miles up the road. However, Knisely observed Wilbanks make an abrupt lane change and drive past the gas station. Based on the totality of the circumstances, Knisely had reasonable suspicion that Wilbanks was the armed robbery suspect, so he activated his blue lights and initiated a traffic stop on Wilbanks. As Knisely approached Wilbanks' vehicle, Wilbanks shifted his vehicle into the drive position and rapidly accelerated back onto Asheville Highway. Knisely advised communications that Wilbanks had fled from the traffic stop and that he was initiating a pursuit. After a 2.9 mile pursuit, Knisely advised communications that he had lost sight of Wilbanks and was therefore cancelling his pursuit. A short time later he heard Master Deputy Miller advise that he believed he was behind Wilbanks' vehicle and was now pursuing Wilbanks. Knisely then heard that Wilbanks had crashed his vehicle on I-85, and went to the scene to confirm that the vehicle he had been pursuing was the same vehicle that had crashed. All of this information is contained in Knisely's *Investigation Report* found in Exhibit A to the Affidavit of William Parris.[1]

---

[1] The information contained in the reports referenced in this memorandum can also be verified by the body worn camera footage being provided.

Deputy C. Evangelista and Deputy Nick Harakas got involved in the vehicular pursuit after Knisely had lost sight of Wilbanks' vehicle. In the *Supplemental Report* also found in Exhibit A to the Affidavit of William Parris, Deputy Evangelista reports that he observed Wilbanks driving erratically and crossing the center line on multiple occasions before Wilbanks lost control of his SUV, drove through the cable barriers, and come to a stop of I-85. Due to the fact that Wilbanks had reportedly used a pistol in the armed robbery of the convenience store only a short time earlier, Deputy Evangelista and Deputy Harakas exited their patrol vehicle and ran towards Wilbanks with their weapons drawn. While approaching Wilbanks, who by this time had exited his SUV, Deputy Evangelista began giving Wilbanks verbal commands to show his hands and to get on the ground. Wilbanks failed to comply with the commands while continually moving to the rear of his SUV. Due to these actions by Wilbanks, Deputy Harakas tackled Wilbanks to the ground. Because Wilbanks continued to resist and would not allow his hands to be controlled so he could be handcuffed, instead tucking them into his chest and trying to roll back and forth, Deputy Harakas deployed his taser. Although the taser malfunctioned, Wilbanks did finally stop resisting and Deputy Evangelista was able to place Wilbanks in handcuffs. Later on the scene I assisted Master Deputy Michael Mapstone in securing Wilbanks into his vehicle for transport to Spartanburg Regional Medical Center, and in response to Wilbanks' complaints that the handcuffs were too tight, I verified that they were not.

Deputy D. Pretlove was on patrol duty on November 9, 2021, and heard the call of the vehicle pursuit over the radio. Because he was on patrol near the pursuit he activated his blue lights to assist Knisely in the pursuit. However, once Knisely radioed that he had lost sight of Wilbanks' vehicle Deputy Pretlove stopped his pursuit as well but remained in

the area in case his assistance was needed again. When Deputy Pretlove heard the call that Wilbanks had wrecked his SUV, he responded to the scene and observed several deputies struggling on the ground with Wilbanks, who was refusing to put his hands behind his back. Deputy Pretlove grabbed Wilbanks' left hand, which he pulled away in an attempt to put under his body. Deputy Pretlove advised Wilbanks to stop resisting but he refused. Because of his continuing resistance and failure to follow the verbal commands of the deputies trying to gain control of him, Deputy Pretlove drew his taser. However, Deputy Pretlove then heard Deputy Harakas yell "taser" and he disengaged with Wilbanks. Deputy Pretlove did not deploy his taser. After Deputy Harakas had deployed his taser Wilbanks was secured in handcuffs by Deputy Evangelista. This information is contained in Deputy Pretlove's *Supplemental Report* which is contained in Exhibit A to the Affidavit of William Parris.

The *Supplemental Report* of Deputy Nick Harakas, found in Exhibit A to the Affidavit of William Parris, states that Wilbanks failed to comply with repeated commands to lay down on the ground, and instead began to back away from his wrecked SUV. Therefore, Deputy Harakas forcibly placed Wilbanks on the ground. Deputy Harakas then gave Wilbanks multiple times to place his hands behind his back, which he continued to refuse, instead rolling back and forth and trying to push other deputies off of him, all the while claiming he was not resisting. When Wilbanks appeared to be attempting to tuck his hands underneath his body, Deputy Harakas, armed with the knowledge that Wilbanks had used a firearm when committing the armed robbery at the convenience store a short while earlier, struck Wilbanks in the left side of his face in an effort to force Wilbanks into compliance. When that failed to stop Wilbanks from resisting, Deputy Harakas drew his

taser, warned that he was about to deploy it, and then deployed it. However, the battery compartment of his taser was compromised, and Deputy Harakas' taser discharged into both himself and Wilbanks. However, the taser deployment did allow the deputies to finally gain control over Wilbanks and get him handcuffed.

Deputy Michael Mapstone had been monitoring the radio traffic of the armed robbery and vehicular pursuit on November 9, 2021, and he arrived on scene after Wilbanks had already been secured by the other deputies. When Deputy Mapstone first encountered Wilbanks he was sitting on the ground with his hands cuffed behind him. Deputy Mapstone assisted Wilbanks to his feet and walked him to his patrol vehicle. As referenced in Deputy Mapstone's *Supplemental Report*, a copy of which is contained in Exhibit A to the Affidavit of William Parris, as well as observed on the body work camera video being supplied herewith entitled *Mapstone*, during the walk to Deputy Mapstone's vehicle, Wilbanks asked Deputy Mapstone on more than one occasion to shoot him. On the body camera footage he also admits that he was trying to roll his SUV over when he crashed in the hope that it would have killed him, and that when he didn't roll his SUV he was going to grab his pistol and point it at the deputies in an attempt at a "suicide by cop" but the pistol got stuck in the side portion of the driver's door. Deputy Mapstone was with Wilbanks when EMS personnel arrived to give Wilbanks a medical assessment, and Deputy Mapstone drove Wilbanks to the Spartanburg Regional Medical Center for further medical treatment before he was booked into the Spartanburg County Detention Center later that afternoon. As a result of his actions on November 9, 2021, Plaintiff is currently awaiting trial on charges of armed robbery, possession of a weapon during the commission of a violent crime, first degree burglary, resisting arrest, receiving stolen goods,

manufacturing, distribution or possession with intent to distribute methamphetamine first offense, manufacturing, distribution or possession with intent to distribute Schedule IV drugs first offense, and failure to stop for blue lights,

Despite Plaintiff's allegations, he has failed to show a genuine issue of material fact that substantiates a violation of his constitutional rights. Although Plaintiff claims that Defendants violated several of his constitutional rights during his arrest, he has come forward with nothing proving any such violations. Therefore, Plaintiff's case lacks any genuine issue as to any material fact, and Defendants are entitled to summary judgment as a matter of law.

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states as to a party who has moved for summary judgment: "The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. In determining whether a genuine issue has been raised, the court must

construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

## ARGUMENT

Although Plaintiff's Amended Complaint contains a narrative of his version of events and his allegations of constitutional violations, it appears that Plaintiff's constitutional claim is primarily focused on the alleged excessive use of force used by the named Defendants during his arrest. Despite Plaintiff's allegations, he cannot prove the elements of this claim as a matter of law.

### A. DEFENDANTS ARE ENTITLED TO THE DISMISSAL OF THIS CASE BECAUSE THEY ARE SHIELDED BY QUALIFIED IMMUNITY

Qualified immunity insulates Defendants from liability in this suit. The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the

court is to follow in determining whether a defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.  In discussing qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a government official from liability from civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994)(internal citations omitted), cert. denied 516 U.S. 116 (1995).

This immunity protects law enforcement officials from liability arising out of acts they perform during the course of their duties, provided those acts are done in good faith and do not violate any clearly established rights secured by the Constitution or laws of the United States. Affording law enforcement officials qualified immunity ensures they can perform their duties free from the specter of endless and debilitating lawsuits. Torchinsky v. Siwinsky, 942 F.2d 257 (4th Cir. 1991). As explained above, Plaintiff's complaints do not rise to the level of constitutionally protected liberty interests or violations of the same.

Moreover, the testimony of the witnesses establishes beyond dispute that Defendants acted in good faith throughout their dealings with Plaintiff. Therefore, Defendants are entitled to qualified immunity and the dismissal of Plaintiff's case.

Deputy Knisely had sufficient probable cause to question and attempt to stop the SUV being driven by Plaintiff on November 9, 2021. Plaintiff then led deputies on a high speed chase and eventually crashed his vehicle in an attempt, by his own admission, to take his own life. When the crash did not have the result he had intended the Plaintiff, again by his own admission, next moved to a plan to commit "suicide by cop," which would explain his repeated failures to obey the lawful commands of the deputies to lay on the ground to be handcuffed, and to continue to resist the deputies' efforts to secure his hands to be placed in handcuffs. To now claim that the force used on him on November 9, 2021 was excessive is ludicrous.

For the reasons discussed above, Plaintiff has failed to show that the Defendants violated any of his clearly established constitutional or statutory rights. Therefore, Defendants are entitled to qualified immunity.

Furthermore, under the holdings of the cases cited above, it does not appear that any of the actions complained of, even if true, would constitute a violation of a known constitutional right. Therefore, regardless of how the facts are interpreted, qualified immunity would shield Defendants from liability. For these reasons, the Court should dismiss Plaintiff's Amended Complaint in its entirety.

B.  **PLAINTIFF FAILS TO STATE A CLAIM UNDER 42 U.S.C. § 1983 BECAUSE HE HAS NOT BEEN DEPRIVED OF A CONSTITUTIONAL RIGHT TO WHICH HE IS ENTITLED**

Plaintiff claims that Defendants used an excessive amount of force to subdue him during his arrest on November 9, 2021. However, based on the record before the Court, none of Plaintiff"s constitutional rights were violated, and Defendants are thus entitled to summary judgment as a matter of law.

In Hudson v. McMillian, 503 U.S. 1 (1992), the Supreme Court held that the initial inquiry in an excessive force claim is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Id. at 7. In Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996), the court adopted the following factors to be considered and balanced in determining whether the use of force was malicious or sadistic: (1) the need for the application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response. Id. at 763, (citing Hudson v. McMillian, 503 U.S. 1 (1992); Whitney v. Albers, 475 U.S. 312 (1986)). The absence of a serious injury is also a relevant factor. Id.

As set forth in the numerous reports surrounding the Plaintiff's arrest on November 9, 2021, all of the above factors were followed by the deputies on the scene. The Spartanburg County Sheriff's Office had received a call about an armed robbery that had taken place at a convenience store on the morning of November 9, 2021. The victim of that crime reported that Plaintiff had pointed a pistol directly at her face while demanding money from the cash register. After leading several deputies on a vehicular chase and then

crashing his SUV, the Plaintiff exited his vehicle and was instructed repeatedly to lay on the ground on his stomach. However, instead of laying down as instructed, he began moving to the rear of his crashed vehicle, forcing Deputy Harakas to initiate a takedown. Plaintiff then resisted the repeated commands of the deputies to stop resisting and to give them his hands. Instead, he rolled back and forth and tried to place his hands underneath his body. Due to the Plaintiff's actions, and his actions alone, Deputy Harakas attempted to subdue the Plaintiff with punches to left side of his face. When that level of force used was insufficient to stop the Plaintiff's continued resistance, Deputy Harakas was forced to deploy his taser. Then, and only then, did Plaintiff stop resisting and he was placed in handcuffs. He was then evaluated by EMS on the scene, taken by Deputy Mapstone to the Spartanburg Regional Medical Center for further evaluation, and then booked into jail.

   Therefore, there was a definite need for force caused by Plaintiff's resistance; the relationship between the needed force and the amount used was reasonable; the threat perceived by the deputies was real, and then he resisted attempts to be handcuffed by the deputies who approached him; and the efforts to temper the severity of the forceful response was clear. As soon as the Plaintiff finally complied and was handcuffed he was assisted to his feet and no other force was used on him. Finally, there is no verifiable injury as a result of the incident, other than a small area on the left side of his face. The Plaintiff has come forward with no medical evidence that he suffered any significant injury during his arrest on November 9, 2021, and the records subpoenaed by the Defendants and produced herein as an exhibit to the Affidavit of William Parris do not bear out any significant injuries, although they do verify Plaintiff's comments made on the scene to Deputy Mapstone that he was attempting to "commit suicide by cop" on November 9, 2021.

Therefore, since there is no evidence of any constitutional violation or use of excessive force during his arrest, Defendants are entitled to dismissal of that claim.

### C. DEFENDANTS ARE ENTITLED TO IMMUNITY FROM SUIT UNDER THE ELEVENTH AMENDMENT

The named Defendants were, at all times relevant to the present action, state officials, serving as Deputy Sheriffs, on behalf of the Spartanburg County Sheriff, a Constitutional Officer in South Carolina, and therefore they enjoy Eleventh Amendment immunity from suit in federal court. *See McIlweine v. Harris*, 2008 WL 2909358 at *12 (citing *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996)). As such the named Defendants, as state officials, are not liable for monetary damages in their official capacity. Therefore, all of Plaintiff's claims for monetary damages should be dismissed by this Court as a matter of law for any claim arising against Defendants in the performance of their official duties.

Plaintiff's claims against the Defendants should also be dismissed as a matter of law because they do not qualify as "persons" subject to suit under 42 U.S.C. §1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 66-67, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). 42 U.S.C.§1983 provides in relevant part: "[e]very person, who under color of any statute, ordinance, regulation, custom or usage with any state ... causes to be subjected any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the injured party ..." It is well settled that neither States nor state agencies are "persons" as defined by 42 U.S.C. §1983, and therefore they are not subject to suit thereunder. *See Will, supra*.

The United States Supreme Court has stated that a suit brought against "a state

official in his or her official capacity is not a suit against the official but rather a suit against the official's office." *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). Further, the Eleventh Amendment to the United States Constitution bars §1983 claims in federal court against a state or state agency defendant. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). In South Carolina, it is also well settled law that a Sheriff is a State Constitutional Officer, and therefore an arm of the State. Because Sheriffs' Deputies serve solely at the pleasure of the Sheriff, they too are considered to be a portion of that agency, and by extension Constitutional Officers. As a result, both the Eleventh Amendment defense, as well as the definition of person, pursuant to 42 U.S.C. §1983, are applicable to the Defendants in their official capacities. *See Cone v. Nettles*, 308 S.C. 109, 417 S.E.2d 523 (1992).

Moreover, the law is well and firmly established that "the mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action." *Lizzi v. Alexander*, 255 F.3d 128, 137 (4th Cir. 2001)(overruled in part on other grounds by *Nevada v. Dep't. of Human Resources v. Hibbs*, 538 U.S. 721, 123 S. Ct. 1972 (2003); *Bender v. Willliamsport Area School Dist.*, 475 U.S. 534, 543, 106 S.Ct. 1326 (1986)). Despite the Plaintiff using terms in his Amended Complaint consistent with this action being brought against Defendants in their individual capacities, the evidence in the record clearly establishes that they could only be acting in their official capacities throughout all of the events referenced in the Amended Complaint. As a result, Defendants are not "persons" subject to suit under 42 U.S.C. §1983.

### D. DEFENDANTS ARE IMPROPER PARTIES FOR STATE LAW CLAIMS

Pursuant to S.C. Code Ann. §15-78-70, Defendants would also affirmatively assert that any state law claims being asserted by Plaintiff must be dismissed as a matter of law. Defendants were all individual employees of the Greenville County Sheriff's Office at all times referenced in the Plaintiff's Amended Complaint, and they were acting within the course and scope of their appointed duties at all times in their dealings with the Plaintiff. Accordingly, S.C. Code Ann. §15-78-70 directs that the appropriate party to this action must be the Agency for which the Defendants were employed at the time of the incidents giving rise to the Amended Complaint. As such, even if the Plaintiff were found to have maintained state law causes of action, Defendants would still be entitled to summary judgment as a matter of law.

Finally, even if all of Plaintiff's allegations are true, the injuries and damages he claims are not sufficiently serious to rise to the level of constitutional significance. "[T]here is a de minimis level of imposition with which the Constitution is not concerned." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996). Plaintiff has described only inconveniences, not serious injuries or damages. The Constitution will not permit him to recover for his purported aggravation or annoyance.

### CONCLUSION

The evidence is clear that Plaintiff was treated fairly and in compliance with constitutional standards and the legal authority in this jurisdiction with regard to the incidents at issue in his Amended Complaint. Defendants thus respectfully submit they are entitled to summary judgment as a matter of law on all of Plaintiff's claims. Therefore, the

Defendants would ask that this Court grant the Defendants motion for summary judgment.

**HOLCOMBE BOMAR, P. A.**

s/ A. Todd Darwin
A. Todd Darwin
Fed. I.D. No. 6382
Post Office Box 1897
Spartanburg, South Carolina 29304
(864) 594-5300
tdarwin@holcombebomar.com

Attorneys for Defendants

Spartanburg, South Carolina
April 17, 2023