IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TIMOTHY WAYNE WILBANKS, | ) | Civil Action No. 7:22-2388-MGL-TER |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DEPUTY NICHOLAS HARAKAS, | ) | REPORT AND RECOMMENDATION |
| DEPUTY C. EVANGELISTA, | ) | |
| DEPUTY M. MILLER, | ) | |
| | ) | |
| DEFENDANTS.[1] | ) | |
| | ) | |

## PROCEDURAL BACKGROUND

Plaintiff, acting *pro se*, filed this action under 42 U.S.C. § 1983[2] on July 25, 2022, alleging a violation of his constitutional rights based on excessive force during an arrest. On April 17, 2023, Defendants filed a motion for summary judgment along with a memorandum, exhibits, and affidavit in support. As the Plaintiff was proceeding *pro se*, the court issued an order on or about April 18, 2023, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the motion for summary judgment procedure and the possible consequences if he failed to respond adequately. On May 2, 2023, Counsel entered a notice of appearance on

---

[1] Plaintiff, through counsel, filed a notice of dismissal without prejudice as to Defendants Pretlove, Mapstone, Powell, Knisley and Stevenson.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

behalf of Plaintiff, and Counsel filed an extension to file a response to the motion for summary judgment which was granted by the court. After the filing of several motions and telephone conferences with the court, Plaintiff, through counsel, filed a response to the motion for summary judgment on September 1, 2023. Defendants filed a reply on September 13, 2023.

## DISCUSSION

## STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324 (Rule

56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## FACTS

Plaintiff alleges that he was subjected to excessive force during an arrest while Defendants argue any force used was reasonable. Plaintiff and Defendants have both submitted video evidence, and Plaintiff has submitted the testimony of the officers from Plaintiff's criminal trial. Therefore, the following facts are taken from the transcript and video evidence.

An armed robbery occurred on November 9, 2021, at approximately 7:06 a.m., at the Spartan Spot in Spartanburg County, South Carolina. At 7:40 a.m., Spartanburg County Sheriff's Office (SCSO) deputies responded to the convenience store regarding the robbery. When the deputies arrived on the scene, they spoke to the store's clerk, Mayuriben Patel. Ms. Patel told the deputies that the man she saw was white and fled the scene on foot. When dispatching deputies, the Spartanburg County

Communications Center initially reported that the suspect was a black male wearing a blue mask, black hat, long sleeve shirt, and shorts possibly driving a red SUV but it was subsequently corrected to a white male. At the time of the robbery, there were no outward facing cameras so no footage of the suspect leaving the store.

The criminal trial with relation to this incident was held in the matter of State v. Timothy Wayne Wilbanks, 2022-GS-42-0353; 0355-0358 in which several of the officers testified.[3] (ECF No. 92-1). At trial, Defendant Miller testified that he currently is retired from the Spartanburg Sheriff's Office after more than twenty-six years and was the canine handler at the time of this robbery. (ECF No. 92-1 at 94). Miller testified that he went to the store where the armed robbery was reported with his canine for tracking. (Id. at 96). While Miller and other officers were watching the video from the store, Sergeant Knisley radioed that he spotted a vehicle that matched the description of the suspect vehicle. (Id.). Knisley became involved in a vehicle chase with a red Durango that he believed to be the suspect, and Miller could hear the siren over the radio indicating that a pursuit had been initiated. (Id. at 97). At that point, Miller stopped what he was doing in an attempt to get near the chase to assist but Sergeant Knisley notified that he had lost the vehicle and called off the pursuit. (Id.). Miller then pulled into the department of motor vehicles and gave a highway

---

[3] The transcript of the criminal trial was submitted by the Plaintiff. (ECF No. 92-1).

patrolman a description of what was transpiring. (Id. at 98). Subsequently, Miller came across a vehicle that matched the description given on the radio. (Id.). Miller initiated his lights but did not have his siren on at the time. (Id.). He angled his vehicle so that his engine block was between him and the suspect's vehicle, a red Durango that matched the description of the suspect vehicle. (Id. at 99). Miller testified that he got into the apex of the door when he opened it and began to draw his weapon as he could see the person in the red Durango was getting extremely nervous looking at him. (Id.). The suspect then went around two vehicles, through the red light and took a right. (Id.). Miller initiated his siren and began to pursue the vehicle, but his canine vehicle was old and slow. (Id.). Thus, he pulled over and allowed Deputy Harakas and Powell to "bl[o]w past him" and Miller became the third vehicle in pursuant. (Id. at 100). When on the interstate, the suspect vehicle wrecked. By the time Miller arrived, he did not necessarily see the vehicle flip or spin only seeing it come to a halt which is when they started ordering the suspect to get out of the vehicle. (Id.). Miller testified that Plaintiff was not complying with orders to get down on the ground so he was "taken down." (Id.). Having been told the suspect was armed, the officers had to believe he was armed. (Id.). Miller drew his weapon and was giving commands and screaming profanities for Plaintiff to get on the ground but he was not complying. (Id. at 107). Miller assisted Deputy Harakas who "made contact" with Plaintiff. He turned

his body cam on when he felt it was safe to do so. (Id. at 102). Miller was on top of the Plaintiff trying to get his arm up to handcuff and his older style body cam turned off during the struggle. Miller testified that during the take down that he still did not know where the gun was located and he was trying to assist when Harakas tased him. (Id. at 102). The suspect was not complying so "you have to elevate it to the next step to try to get the situation under control as quickly and safely as possible for everyone." (Id.). Miller testified that he "could not tell exactly at what point the tasing happened" because he was on top trying to get the suspect's arm behind his back. (Id. at 108).

Officer Harakas testified that he had a training deputy with him and went to the call at the gas station where the robbery occurred. (ECF No. 92-1 at 111). Harakas testified "so we initially put a dog on the ground to try and track because we had gotten word that there was –or he had left on foot. We immediately tracked around to the back side of the building where there were no cameras which are visible from the road. And I believe that there were fresh tire tracks and everything from where a vehicle had appeared to have been parked. Shortly after we starting getting updated information— a lot of times when we have third-party calls or call for other people, it goes through our dispatch and then comes to us. So the information can be delayed." (Id. at 112). Harakas testified that while investigating the robbery they received updated information that the suspect's vehicle was possibly a red colored Durango.

(Id.). Therefore, Harakas and Deputy Evangelista were assisting Deputy Stevenson in the investigation when Sergeant Knisley "keyed up on the radio that he was getting out with a vehicle that matched the description of the red Durango." (Id. at 113). They were then advised Knisley lost sight of the vehicle. (Id.). Deputy Miller then responded that the vehicle possibly was on Business 85 at the stoplight. (Id. at 114). At that point, Harakas reactivated all of his lights and sirens to respond to Deputy Miller as quickly as possible. (Id.). Harakas caught up to the suspect's vehicle which went airborne over the southbound lanes of Business 85 into the retaining wire and median and rolled over a few times. (Id. at 116). Due to the information that the suspect was armed, both Harakas and Evangelista drew their service weapons and approached the suspect. (Id.). Harakas gave the suspect multiple demands to get on the ground but he failed to do so. (Id.). Because he was in the center of Business 85 and noncompliant, Harakas used force to bring him down on the ground and detain him. (Id. at 117). The vehicles on the northbound lane at the crest of the hill were stopped in case of a shootout. (Id.). While Harakas used force to take him down, Evangelista continued to provide cover with his firearm drawn. (Id.). Harakas testified that he brought him to the ground with the assistance of a few other officers, and they were attempting to get him detained. (Id.). After the officers were able to turn Plaintiff onto his stomach, he attempted to tuck his hands up underneath to keep the officers

from handcuffing him. (Id.).  Harakas testified that he still did not know if he had a firearm so:

> I struck the–struck him a few times trying to get him to bring his hands out from under his stomach to his face so that I could grab his arm. It somewhat worked in the sense that I got his left hand. I had a handcuff placed on his left hand, but he was not detained.  He was still resistive and he was still combative. His right arm was still tucked up underneath his stomach. So at that point I stood up and advised the responding officers who were assisting me to effect the arrest that I was going to deploy my taser. I then per policy yelled taser, taser, taser.  Deployed my taser. And due to that, they were able to get his right arm and place his right arm in handcuffs and secure him, detain him, and place him in the vehicle. . . . As soon as the handcuffs were placed, we stood him up and walked him to the vehicle and put him in another deputy's vehicle, no other force was used."

(Id. at 118).

Harakas also testified that his body cam cut off during the confrontation as it was an older model.  (Id. at 119).

Upon cross examination, Harakas testified that when Plaintiff was taken to the ground, his hands were in the air but he refused to get on the ground. During the take down, Harakas testified that Plaintiff stated that he was not resisting and was asking them to stop but testified that "actions and words are different." (Id. at 123). Harakas testified that he hit Plaintiff in the face with a closed fist "two to three times" in an attempt to get his hands hancuffed. Id. Harakas also testified that his battery

compartment on the taser broke off during the altercation so that when he tased Plaintiff in the back, it went into his hand stating that "[b]ut it was a successful taser deployment outside of my hand getting a little bit tore up." (Id. at 124). Harakas testified that Plaintiff was on the ground with a single handcuff on his left hand with other officers attempting to effect an arrest while in the middle of Business 85 northbound. (Id. at 125).

Officer Pretlove testified that he was made aware of a vehicle pursuit with an armed robbery suspect and while he did not engage in the actual vehicle pursuit, he did have an interaction with the driver. (Id. at 185). As standard procedure, Officer Pretlove was wearing a county-issued body-worn camera. (Id. at 186). Pretlove testified that Plaintiff was resisting arrest and not complying. (Id. at 189). There were at least three, possibly four, officers involved in attempting to handcuff Plaintiff and once he was handcuffed and in custody there was no more force used. (Id.). Pretlove testified that if Officer Powell was wearing a body-worn cam it would reflect what happened. (Id. at 187). After watching the video from Powell's body-worn cam, Pretlove testified that it appeared Officer Powell had her hand across her cam waiting to call in on her radio to let everyone know that the suspect was in custody. (Id. at 189). Pretlove testified that he did not see Plaintiff being hit in the head with a taser. (Id. at 191).

Plaintiff argues that he complied with the officer's directions and exited the vehicle with his hands in the air when one of the officers rushed the Plaintiff, drove him to the ground, and began to strike him in his head, face, and body. Plaintiff asserts that Deputy Harakas tackled him with such force that his body camera dislodged and flew several feet away from his body. Plaintiff asserts that the deputies instructed him to roll onto his stomach before flipping him onto his back, and then returned him to his stomach. Plaintiff contends that Deputies Harakas, Evangelista, Miller, and Pretlove knelt on Plaintiff's legs, waist, and lower back before pinning his arms both behind his back and under his stomach. Plaintiff asserts that while his arms were pinned and deputies were kneeling on the Plaintiff, Harakas punched him multiple times with a closed fist and deployed his taser, striking Plaintiff in the back. Plaintiff was taken to the Spartanburg Regional Hospital where he was treated for his injuries. Plaintiff argues that the conduct was objectively unreasonable and that Defendants are not entitled to qualified immunity because established law prohibits officers from using excessive force when the individual does not pose a threat or risk of flight.

Defendants argue that Plaintiff's clam for excessive force should be dismissed because no reasonable juror could find that they used excessive force against Plaintiff based on the record before the Court. Defendants argue, even assuming excessive force, they are nonetheless entitled to qualified immunity.

## ANALYSIS

A claim that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person ... [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). In applying the objective reasonableness standard, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U.S. at 396–97).

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." Graham v. Connor, 490 U.S. 386, 395 (1989). This Court must analyze whether an officer's actions were objectively reasonable in determining if the force brought to bear was excessive. Id.; Stanton v. Elliott, No. 21-1197, 2022 WL 288012, at *4 (4th Cir. Feb. 1, 2022) (citing Elliott v. Leavitt, 99 F.3d 640, 642–43 (4th Cir. 1996)); E.W. by & through T.W. v. Dolgos, 884 F.3d 172, 179 (4th Cir. 2018). "Determining the reasonableness of an officer's actions 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake.' " Dolgos, 884 F.3d at 179 (quoting Graham, 490 U.S. at 396); Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

Courts evaluate the following three factors when determining if the force used by an officer was reasonable: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Dolgos, 884 F.3d at 179 (quoting Graham, 490 U.S. at 396). Courts may additionally consider "other 'objective circumstances potentially relevant to a determination of excessive force.' " Id. (quoting Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015)). For example, the "extent of the plaintiff's injuries is also a relevant consideration." Buchanan, 325 F.3d at 527. However, "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant." Pegg v. Herrnberger, 845 F.3d 112, 120 (4th Cir. 2017) (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)). "The ultimate question is whether the totality of the circumstances justified a particular sort of seizure." Dolgos, 884 F.3d at 179 (quotations and citations omitted).

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). It protects "all but the plainly incompetent or those who knowingly

violate the law." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Under the well-known analysis of Saucier v. Katz, 533 U.S. 194 (2001), the Court must ask two questions: (1) "whether a constitutional violation occurred"; and (2) "whether the right violated was clearly established." Henry, 652 F.3d at 531. The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). If a court decides in the negative the first prong it considers—i.e., the court decides the plaintiff has not alleged the deprivation of an actual constitutional right or the right was not clearly established at the time of the alleged violation—the court need not consider the other prong of the qualified immunity analysis. See id. at 243–45; Torchinsky v. Siwinski, 942 F.2d 257, 260 (4th Cir. 1991) (holding the court "need not formally resolve" the constitutional question of "whether the [plaintiffs] were arrested without probable cause" to address the plaintiffs' § 1983 claim; the court stated that it "need only determine whether [the defendant]—a deputy sheriff performing within the normal course of his employment—acted with the objective reasonableness necessary to entitle him to qualified immunity"). Accordingly, if the answer to either question is no, immunity attaches.

Here, in considering the Graham balancing analysis, the evidence indicates that Plaintiff was arrested after being in a high speed vehicle pursuit as a suspect in an armed robbery ending in Plaintiff wrecking his vehicle. Therefore, Plaintiff was suspected of being armed, committing a violent offense with the use of a gun and refused to get on the ground when commanded to do so. Accordingly, this factor weighs in Defendants' favor.

The second and third factors also weigh in Defendants' favor. Based on the testimony and video evidence, once Plaintiff wrecked his truck, he got out of the truck with his hands raised. Smoke appears to be in the air and Plaintiff turns to walk away from the vehicle and the officers. After Plaintiff failed to get on the ground as commanded, Officer Harakas tackled Plaintiff to the ground. The video evidence depicts that several officers were attempting to get Plaintiff's arms and hands from underneath his body to place him in handcuffs and secure the situation but Plaintiff continued to resist. Due to Plaintiff resisting arrest and refusing to be handcuffed, Officer Harakas struck Plaintiff in the face/head with a closed fist several times attempting to handcuff his left hnd and tased him once in the back to gain control to andcuff his right hand. Even though the officers had been able to handcuff one of Plaintiff's hands, they had not been able to gain control of the other hand to secure him in handcuffs.

The video evidence depicts that while Plaintiff was saying that he was not resisting, was not fighting, and to please stop, he was continuing to be non-compliant by resisting the handcuffs and refusing to obey the officers' commands to place his hands behind his back. The officers were aware that Plaintiff was wanted for an attempted armed robbery, they did not know if he had a weapon on his person, and it was reasonable for the officers to believe that Plaintiff was armed and may have possessed a gun. Thus, Plaintiff posed an immediate threat to the safety of the officers. Further, Plaintiff refused to comply with demands to get on the ground and put his hands behind his back for handcuffing, and the officers were attempting to gain control of the situation as quickly as possible. The video demonstrates that as soon as the officers were able to gain control and secure the Plaintiff by placing both hands in handcuffs, no further force was used. The undersigned is mindful of the need for split-second decisions made by law enforcement officers under such circumstances and the need to quickly gain order and safety.[4] Based on the video evidence presented, the time from when the officers first yelled for Plaintiff to get on the ground until he was tased was approximately thirty-eight seconds. Even viewed in the light most favorable to Plaintiff, a reasonable officer could have believed Plaintiff was armed

---

[4] Additionally, "[c]ourts have held that use of a taser gun to subdue a belligerent suspect who has repeatedly ignored police instructions is not excessive force," Davis v. Richland Cnty., 2014 WL 3805798, at *5, Report and Recommendation adopted in relevant part by 2014 WL 3805802, at *3 (D.S.C. July 30, 2014).

and, thus, posed an immediate threat which was likely to be cured by the use of the taser in the tense and uncertain situation. Thus, the deployment was justified.[5] Based on a totality of the circumstances, Defendants did not violate Plaintiff's Fourth Amendment rights and, therefore, Defendants would also be entitled to qualified immunity under the first prong of the analysis. Thus, it is recommended that Defendants' motion for summary judgment be granted as to the allegations of excessive force during the arrest.

## **ELEVENTH AMENDMENT IMMUNITY**

Defendants first argue that they are immune from suit pursuant to the Eleventh Amendment of the constitution. Defendants argue that Plaintiff's claims against them, in their official capacity, fail as a matter of law, as they are not a "person" amendable to suit and are entitled to immunity.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution.

---

[5] Because no constitutional violation occurred, we need not reach the second prong of the qualified immunity inquiry.

Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state. The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. Will v. Michigan Department of State Police, 491 U.S. 58, 70 (1989). In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

The United States Supreme Court has long held the Eleventh Amendment also precludes suits against a state by one of its own citizens. See Edelman v. Jordan, 415 U.S. 651, 662–63 (1974). A plaintiff "is not entitled to monetary damages under § 1983 against Defendants in their official capacities." Moneyhan v. Keller, 563 F. App'x 256, 258 (4th Cir. 2014) (citing Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996) (holding that Eleventh Amendment bars suits against non-consenting state, its agencies, and its officers acting in their official capacities)). However, suits for damages against state officials sued in their individual capacity are not barred by the Eleventh Amendment. See Hafer v. Melo, 502 U.S. 21, 30–31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and

personal liability' on state officials under § 1983.") (citation omitted).

To the extent Plaintiff sues Defendants in their official capacities, they are not subject to suit under §1983, and the undersigned recommends the district judge grant Defendants' motion for summary judgment regarding claims brought against them in their official capacity for monetary damages.

## **CONCLUSION**

Accordingly, it is recommended that Defendants' motion for summary judgment (ECF No. 65) be granted.

|  |  |
|---|---|
|  | s/Thomas E. Rogers, III |
| December 15, 2023 | Thomas E. Rogers, III |
| Florence, South Carolina | United States Magistrate Judge |

The parties' attention is directed to the important notice on the next page.